UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 1:17-cv-2630 |
| MUSTAFA DAVID SAYID, | ) | |
| KEVIN JASPER, and | ) | JURY TRIAL DEMANDED |
| NORMAN T. REYNOLDS, | ) | |
| | ) | |
| Defendants. | ) | |

_____ )

## COMPLAINT

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following against defendants Mustafa David Sayid ("Sayid"), Kevin Jasper ("Jasper"), and Norman T. Reynolds ("Reynolds") (collectively, the "Defendants"), and hereby demands a jury trial:

## PRELIMINARY STATEMENT

1.      This is securities fraud enforcement action against a New York-based attorney, David Sayid, who used his position as a securities lawyer to take control of two publicly traded shell companies and rig them for use in market manipulation schemes to enrich himself and others at the expense of the investing public.

2.      As Sayid represented clients in connection with a securities fraud investigation, he exploited his position as the companies' counsel to assume control of these two companies. Sayid used that control to facilitate stock transactions that enabled a small number of persons and their affiliates to receive millions of shares of stock that should have been labeled with restrictive legends to prevent further transfers, unless the sellers of the stock complied with strict regulatory requirements.  Sayid also made false representations and used false and fraudulent documents to

persuade the companies' stock transfer agent that the shares were not required to carry any restrictive legend, and thus enabled the shareholders to sell these shares directly to the public -- in violation of the federal securities laws.

3.      The Commission and OTC Markets, a leading marketplace for securities traded over the counter, have rules in place that require, among other things, the disclosure of adequate current information about issuers to market participants.  Further, the Commission has rules restricting the resale of securities received in unregistered offerings or received from issuers or affiliates who have received their shares in unregistered offerings.  Sayid, a securities lawyer with experience practicing in this area of the market, abused his position of trust and professional responsibility to evade these and other market rules.

4.      As early as June 2010, Sayid represented a set of public shell companies that had been the subject of boiler room manipulation frauds.  He also represented control persons whom the Commission investigated and ultimately charged with operating the manipulations.  The control persons settled the SEC enforcement action.  As Sayid represented clients through the investigation, however, he started taking steps that would lead to his effective control of at least two of these publicly-traded companies, Nouveau Holdings, Ltd. ("Nouveau") and Striper Energy, Inc. ("Striper").

5.      Sayid assumed control of these entities by, among other things, installing officers and directors who were under his control or directing the actions of existing officers and directors.  He readied these companies for unlawful stock transfers by making misrepresentations to OTC markets, investors, the companies' transfer agent, and others.  Sayid used his controlling position to cause these companies to issue millions of shares of stock to third parties who intended to sell that stock following false and misleading promotional campaigns and who

2

thereafter kicked back part of the profits to Sayid.  He prepared the companies for false and misleading promotional campaigns by searching out and negotiating corporate mergers with existing non-public companies that had, or appeared to have, business operations that could be touted in press releases and promotional materials.  Sayid also orchestrated the unlawful transfer of stock -- without restrictive legends --  to persons who would execute the promotional campaigns and trading activities.  And, he further directed the execution of reverse stock splits to ensure that those executing promotional campaign and selling the unlawfully transferred shares would hold a dominant position in the market for the companies' stock.

6.     Sayid enlisted his paralegal, Kevin Jasper ("Jasper"), to serve as the nominal head of Nouveau and Striper to disguise the fact that Sayid was the person exercising control.  As Sayid and Jasper well knew, Jasper came to Sayid with no experience or training to serve as a corporate officer or director.  Nevertheless, Sayid placed Jasper in positions of corporate authority in both companies. Despite Jasper's appearance in corporate authority, however, Sayid took direct action on behalf of the companies by, for example, negotiating corporate mergers and acquisitions and by deciding when and how board minutes should be drafted.  Further, although Jasper appeared to be acting as head of these companies by signing corporate agreements, signing fabricated corporate board minutes, and certifying misleading periodic financial reports submitted to OTC Markets, he was at all relevant times directed by Sayid.

7.     Sayid also enlisted the substantial participation of a Texas based attorney, Norman Reynolds ("Reynolds"), who assisted in the scheme involving Nouveau, which caused more than 4 million shares of the company's stock to be issued without restrictive legend and sold into the market in violation of federal securities laws.  Sayid hired Reynolds to send Nouveau's transfer agent two fraudulent legal opinion letters, which persuaded Nouveau's stock

transfer agent to remove restrictive legends from millions of shares of Nouveau stock, setting the stage for the illegal sale of those shares to the public.  Reynolds drafted fraudulent legal opinion letters with the understanding that they would be sent to Nouveau's transfer agent notwithstanding that Reynolds knew or should have known that the representations he made in them were false.  At the time Reynolds drafted these fraudulent opinion letters, he negotiated with Sayid to receive a portion of the proceeds from the eventual sale of the stock that was transferred without restrictive legend in reliance upon Reynold's letters.

8.      Sayid also coordinated his efforts with two other persons, Mitchell Brown ("Brown") and Michael Affa ("Affa").  Affa and Brown worked with Sayid in arranging corporate acquisitions for the shell companies.  They later ran the false and misleading promotional campaigns and stock trading activities.  In working together, Sayid, Affa and Brown collectively intended to structure a stock trading scheme in which Sayid would sell Affa and Brown convertible debt that Affa and Brown could convert to stock that would purportedly be free of affiliate restrictions, and that Affa and Brown would then sell for a profit during a promotion of the acquisitions.  As of 2012, when they dealt with Sayid, Affa and Brown were already experienced in executing pump and dump market manipulations, that is fraudulent schemes in which corporate insiders drum up public demand for a company's stock (the "pump"), often using false or misleading promotional campaigns, in order to sell shares to the public while concealing their controlling status (the "dump").  In 2015, Affa and Brown pled guilty to criminal charges relating to the operation of other pump and dump schemes.  *United States v. Affa, et al.*, 14-cr-10221-WGY (D. Mass.); *United States v. Brown*, 15-cr-10297-WGY (D. Mass.).  They are currently serving prison terms imposed as part of their sentencing in those proceedings.

9.      Over the course of Sayid's three year scheme to control the shells and profit from the unlawful sale of Nouveau and Striper stock, Sayid earned more than $186,000.  He also caused Jasper to be paid more than $21,000.  Reynolds ultimately received $700 for issuing his fraudulent opinion letters.  Although Reynolds had negotiated with Sayid to receive more money from proceeds of the trading activities following the unlawful stock issuance, Sayid did not pass these proceeds along.

10.      By knowingly and recklessly engaging in the fraudulent conduct described herein, Sayid, Jasper, and Reynolds violated the antifraud provisions of the federal securities laws, specifically, Sections 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

11.      By engaging in the conduct described herein, Sayid and Reynolds violated the registration provisions of the federal securities laws, specifically, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) & (c)].

12.      Based on this conduct, the Commission seeks the following relief against the Defendants: (i) entry of permanent injunctions, pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), prohibiting Defendants from engaging in future violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder; Section 17(a) of the Securities Act of 1933, and further prohibiting Sayid and Reynolds from engaging in future violations of Sections 5(a) and 5(c) of the Securities Act; (ii) an order requiring Defendants to disgorge their ill-gotten gains and pay pre-judgment interest; (iii) an order requiring Defendants to pay appropriate civil monetary penalties; (iv) an order barring Defendants from participating in any offering of penny stock, pursuant to Section 20(g)

5

of the Securities Act, 15 U.S.C. § 77t(g) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d); (v) an order barring Sayid and Jasper from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e) and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d); and (vi) an order barring Sayid and Reynolds from participating in the preparation or issuance of certain attorney opinion letters in connection with the offer or sale of securities pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d).

## **JURISDICTION**

13.     The Commission brings this action pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

14.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], and Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u(e) and 78aa].  Venue is proper in this District under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because (a) Sayid transacts business in New York City; (b) Kevin Jasper is an inhabitant of New York City; and (c) the Defendants' acts and practices alleged herein occurred primarily in New York City, including (i) the offer or sale of securities took place in New York City, (ii) Nouveau and Striper were headquartered in New York City, and (iii) Sayid's law office was located in New York City.

15.     The Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, or of the mail, in connection with the acts, practices, and courses of business alleged herein.

## DEFENDANTS

16. **Mustafa David Sayid**, age 60, resides in Haworth, New Jersey.  Sayid has been the managing partner of the law firm of Sayid and Associates, LLP ("Sayid and Associates") in New York City since 1992 and is presently registered as an attorney in New York, Massachusetts, and Pennsylvania.  During the relevant period, Sayid purported to be outside legal counsel for Nouveau and Striper.  When subpoenaed to testify and produce documents in connection with the Commission's investigation that led to this Complaint, Sayid asserted his Fifth Amendment privilege against self-incrimination.

17. **Kevin Jasper**, age 57, resides in New York City.  During the relevant period, Jasper was employed by Sayid and Associates – first as an office assistant and later as a paralegal.  At various times during the relevant period, Jasper also served as president and/or CEO of Nouveau and Striper and served as a director of Nouveau and Striper.

18. **Norman Reynolds**, age 77, resides in Houston, Texas.  Reynolds is the sole employee at his law firm, the Norman T. Reynolds Law Firm, P.C. in Houston, Texas, and is presently registered as an attorney in Texas.

## RELEVANT ENTITIES

19. **OTC Markets Group** ("OTC Markets") is a financial market providing price quotes and volume information for equity securities traded over-the-counter ("OTC") and between broker-dealers who make markets for the traded securities.  Many equity securities trading in the OTC market in the United States trade through the company's OTC Link platform, which is an alternative trading system registered with the Commission as a broker-dealer.

20. **Nouveau Holdings, Ltd.** (f/k/a Spectrum Acquisition Holdings Corp.; f/k/a First American Railways, Inc.; f/k/a Barona Enterprises, Inc.), is a Nevada corporation which claims

to have a principal place of business in New York City at the same address as Sayid's law firm. Nouveau has been dormant since 2015; its business license expired on March 31, 2015. Nouveau is a purported "'green' mining equipment technologies consortium specializing in 'small footprint' technologies." It had no revenues and only nominal assets during the relevant period.  Nouveau's common stock is quoted on OTC Link operated by OTC Markets under the ticker symbol "NHLI", but Nouveau has not submitted a quarterly or annual report to OTC Link since November 2014.  As of September 2014, approximately 95% of Nouveau's approximately 170 million outstanding shares were issued to Sayid himself or to present or former officers and directors who took direction from Sayid.

21.     **Striper Energy, Inc.** (f/k/a Corporate Partners Corporation; f/k/a Insight Management Corporation; f/k/a Skreem Records Corporation) is a Florida corporation which presently claims to have a principal place of business in Addison, Texas.  In 2012, Striper claimed to have a principal place of business in New York City at the same address as Sayid's law firm.  At that time, Striper purported to be a "development stage company" focused on the "green enterprises."  It had no revenues and only nominal assets during the relevant period. Striper's common stock was quoted on OTC Link operated by OTC Markets under the ticker symbols "ISIM" and "CPCC" until May 2016, but Striper failed to submit a quarterly or annual report to OTC Link during the period from May 2013 to December 2015.  On May 6, 2016, the Commission issued a trading suspension on Striper's stock "due to questions regarding the accuracy and adequacy of publicly disseminated information in the company's December 31, 2015 annual report and accompanying financials provided to OTC Markets."

## FACTUAL ALLEGATIONS

**I.      Sayid Obtains Control of Nouveau and Striper and Issues False Opinion Letters to OTC Markets**

22.     In May 2012, the Commission filed a complaint in an action captioned *SEC v. Geranio, et al.*, 12-cv-04257-BRO-JC (C.D. Cal.) alleging violations of Section 17(a) of the Securities Act and Section 10(b) and Rule 10b-5 thereunder arising from the alleged perpetration of an offshore boiler room scheme involving certain publicly traded shell companies, including Nouveau and Striper (collectively, the "Shells").  The complaint alleged that the named defendant, Nicholas Geranio, created the Shells, installed management, concocted consulting arrangements with the Shells, and instructed management how to run the Shells.  In August 2013, Geranio consented to the entry of a judgment against him.

23.     Sayid, who provided legal representation to Geranio and others during the Commission's investigation, stepped into Geranio's role as the control person for the Shells in the months preceding the filing of the Commission's case.  Sayid did so by convincing the management of the Shells to follow his direction and by installing individuals whom he could control in positions of authority.  Sayid maintained his control by holding himself out as a subject matter expert with a plan to make the Shells profitable.  In furtherance of this promise, Sayid represented to the then-President of Nouveau ("Person 1") and to Jasper (then President of Striper) that he was engaged in merger negotiations on their companies' behalves, and asked them to locate "non-affiliated aged debt" that could be used to facilitate the issuance of shares of stock in connection with the potential mergers.

a.     With respect to Nouveau, in April and May 2012, Sayid represented to Person 1 that Geranio was no longer running the companies.  Sayid then assured Person 1 by email that he would not allow Geranio's enterprise "to sink NO MATTER WHAT."

9

During the period from April 2012 until Person 1's resignation in November 2013, Sayid provided funding to Nouveau and directed the activities of Person 1.  Among other things, Sayid instructed Person 1 to install Jasper and another individual ("Person 2") as board members.  In November 2013, Sayid instructed the board members to install Jasper as Nouveau's CEO.

        b.      With respect to Striper, Sayid had previously, in March 2010, installed Jasper and Person 2 as the company's only board members, using stock held in a trust for Geranio that was managed by Sayid's then-law partner.  At all relevant times, Jasper and Person 2 deferred to Sayid regarding all aspects of the management of the Shells.

24.      As Sayid started laying the groundwork for his assumption of control of the Shells in April 2012, he also submitted false opinion letters to OTC Markets.  These opinion letters were designed to ensure that (1) Nouveau and Striper would be considered as having "adequate current public information" for the purpose of satisfying the "resale" exemption under Securities Act Rule 144; and (2) the SEC's investigation of Nouveau's and Striper's control persons would not be disclosed in those filings.

25.      OTC Markets, which quoted prices for Nouveau and Striper, provides a service through which issuers may make "adequate current information" publicly available through its website.  This service is called the OTC Disclosure and News Service.  To qualify for adequate current information disclosure under this service, OTC Markets requires that the issuer submit electronic copies of:  (1) annual financial statements for the previous two years, (2) any quarterly reports since the most recent annual report, and (3) if the financial reports are not audited, an attorney opinion letter containing certain required information.  As part of the attorney opinion letter, OTC Markets requires that the letter report whether there are outstanding securities

investigations.  Specifically, the letter must state "to the best knowledge of counsel, after inquiry of management and directors of the issuer, whether or not the issuer of securities, any 5% holder, or counsel is currently under investigation by any federal or state regulatory authority for any violation of federal or state securities laws, and if so, the details of such investigation must be provided."

26.     On or about April 17 and April 27, 2012, Sayid sent OTC Markets opinion letters which falsely certified that "neither the Company, nor its officers, directors, five (5%) percent holders, nor Counsel are currently under investigation by any federal or state regulatory authority for any violation of federal or state securities laws."

   a.     Sayid's representation was knowingly false when made as to Nouveau because Sayid had previously received a Wells notice for Keith Field, a director of the company who owned more than 5% of the company's common stock during the relevant period.  The Wells notice stated the Commission's staff had made a preliminary determination to recommend that the Commission file an enforcement action against Field for violations of the federal securities laws.

   b.     Sayid's representation was knowingly false when made as to Striper because Sayid had previously received Wells notices for Geranio and certain entities that Sayid knew Geranio controlled.  One of these Geranio entities owned more than 5% of the company's common stock during the relevant period.  The Wells notices stated the Commission's staff had made a preliminary determination to recommend that the Commission file an enforcement action against them for violations of the federal securities laws.

27.     In the April 2012 letters to OTC Markets, Sayid also falsely certified that the Shells provided "adequate current public information" despite statements in the company filings that Sayid knew to be false because they omitted the Shells' relationships with Geranio during the period of time addressed in the filings.

28.     Based upon the false opinion letters Sayid signed in April 2012, OTC Markets designated the Shells as having provided current information in the OTC Disclosure and News Service without having had their financials audited.  Sayid understood his representations would be relied upon for this purpose.  He expressly stated in his April 2012 opinion letters that OTC Markets "is entitled to rely on the contents of this letter in determining whether the Issuer has made adequate current information publicly available within the meaning of Rule 144(c)(2)" and further stated that "OTC Markets . . . has full and complete permission and rights to publish this letter with OTC Markets News Service for viewing by the general public and regulators . . . ."

29.     In the four months following his issuance of false attorney opinion letters, Sayid obtained $44,500 from the Shells for purported legal fees.  The money used to pay the fees was generated entirely from stock issuances by the Shells.

30.     In April 2012, Jasper, as president of Striper, signed false financial statements which hid Geranio's, and then Sayid's, control of the company.  In doing so, he conspired with Sayid to obscure the Commission's action against Geranio from the investing public and to maintain Striper's status as providing adequate current information as required for Rule 144 eligibility.  Following the publication of the false financials, Jasper obtained more than $21,000 from Sayid and Striper.  The payments that Jasper received from Striper were from funds generated entirely from stock issuances by Striper.

## II.     Sayid Engineers the Sale of His Purported Legal Fees in Striper in Furtherance of a Failed Pump and Dump Scheme

31.     In June 2012, less than one month after the Commission filed its complaint against Geranio, Sayid began negotiating with Person 3 ("Person 3") to merge Sayid's so-called "shells" with Person 3's operating companies.  During mid- to late-2012, Sayid conducted various meetings at his law office with Person 3, Person 4 ("Person 4"), Affa, and Brown, among others, to discuss the Shells.  Person 3 and Person 4 were potential investors with ties to operating companies that were looking for access to the public markets.  Affa and Brown were potential investors and stock promoters.

32.     In August 2012, Sayid put in motion a plan to (1) reduce the number of outstanding Striper stock shares, and (2) steer newly issued Striper shares without restrictive legends to Affa and Brown for their use in a pump and dump of Striper stock.  On August 14, 2012, Jasper, at Sayid's direction, used his preferred "A" super voting rights to approve a 1 for 500 reverse split of Striper's common stock.  The reverse split reduced the total number of shares of Striper's issued and outstanding stock from approximately 364 million to approximately 1 million and thereby greatly reduced the number of shares in the hands of any public investors who were outside of Sayid's and Jasper's control.

33.     After the reverse split in September 2012, at Sayid's direction, Jasper signed backdated Striper board resolutions ratifying Sayid's legal fees and authorizing the conversion of this outstanding debt to equity, that is, to newly issued shares of stock in the company.  Jasper falsely certified that the meetings referenced in the resolutions had occurred on the dates referenced in the resolutions when, in fact, there had been no such meetings.

34.     In January 2013, Sayid orchestrated Striper's reverse merger with Advantage Disposal Solutions, Inc. ("Advantage"), a company introduced to him by Person 3.  The

Advantage acquisition provided the occasion for announcement of positive news about Striper's purported business prospects.  This was for the planned "pump" of Striper's stock, which Sayid knew Affa and Brown intended to use to sell Striper shares.

35.     Also in January 2013, Sayid received $50,000 from Brown to prepare a three-way agreement whereby Sayid would transfer $100,000 of the legal fees that Striper purportedly owed to Sayid's law firm to eight different nominee entities that had been established offshore, in the nation of Belize.  Sayid knew or was reckless in disregarding the fact that these entities were actually controlled by Person 3, Person 4, Affa, and Brown (hereinafter referred to as the "Striper Debt Settlement Agreement").  Pursuant to the same three-way agreement, Striper agreed to "pay" the assigned legal fees "by way of the issuance of one hundred million (100,000,000) shares" of stock to the Belizean nominee entities.  Sayid drafted the Striper Debt Settlement Agreement and further participated in structuring the transaction through nominee entities.  These arrangements served to obscure the scheme to "dump" Striper's stock.  Sayid (i) instructed Person 4 to send money to Belize to set up a nominee entity and (ii) coordinated the attempted deposit of shares that had been issued pursuant to the Striper Debt Settlement Agreement with a Belizean broker.

36.     The Striper Debt Settlement Agreement contained a number of misrepresentations and omissions known to Sayid.  First, the agreement represented that it was made and entered into in November 2012 and that Sayid had received value for the transfer of his debt as of that date.  In fact, Sayid well knew he had not received payment from Brown until January 2013.  Second, Sayid knew that the list of nominee entities to which the debt was being transferred was not finalized until at least February 2013.  Third, the agreement obscured that the nominees were under common control.  Sayid was on notice that the nominees were controlled by Affa, Brown

and their associates; Sayid himself had been engaged in structuring the transaction through the nominee entities and he received his payment from a single person, Brown.  And fourth, the agreement was based on a transfer of debt that that Striper purportedly owed to Sayid for legal fees, debt which was represented to have been incurred more than one year prior to the Striper Debt Settlement Agreement.  In fact, as Sayid and Jasper well knew, the Striper board had ratified the fees only months earlier, using backdated resolutions.

37.     Sayid provided the fabricated and backdated Striper Debt Settlement Agreement and other false documents and information to an attorney, Person 5.  Person 5 relied on this material to write an opinion letter addressed to Striper's transfer agent, stating that Striper common stock could appropriately be issued to the eight Belizean nominee entities without a restrictive legend.

38.     As a general rule, the Federal securities laws make it unlawful for any person to offer or sell securities unless such offering or sale is registered with the Commission or is exempt from registration under Commission rules.  This general rule applies to offerings or sales made by the company issuing the securities as well as any resale of those securities.

39.     Commission Rule 144 creates an exemption from the registration requirement for persons seeking to resell securities that are not otherwise exempt from the registration requirements of Section 5 of the Securities Act.  For affiliates of an issuer, including persons who control, or are under common control with, a company that has issued stock, Rule 144 imposes a series of strict limitations, such as minimum holding periods (prohibiting the sale of shares to the public unless the seller has held those shares for the requisite time) and volume restrictions (limiting the number of shares that may be sold, based on the total trading volume of the securities in question).  These restrictions preclude or greatly constrict stock sales by those

who control companies, preventing them from dumping large amount of stock into the market.

40.     Further, the rule's exemption is generally not available to shell companies, which are easy vehicles for manipulation.

41.     If the applicable conditions of Rule 144 are met, however, the seller of the securities is not considered an underwriter of the securities for purposes of Section 2(a)(11) of the Securities Act and therefore may sell the securities pursuant to the Section 4(a)(1) exemption from Section 5 of the Securities Act for "transactions by any person other than an issuer, underwriter, or dealer."

42.     After receiving Person 5's opinion letter in December 2012, Sayid transmitted it to Striper's transfer agent knowing that the letter contained misrepresentations that would cause the transfer agent to issue Striper stock without an affiliate restriction when it was improper to do so.  Specifically, Sayid knew when he transmitted Person 5's opinion letter that it falsely stated (i) that Sayid was not an affiliate of Striper, (ii) that Striper was not a shell company, and (iii) that anticipated conversions of Sayid's debt by the Belizean nominee entities would not cause them to own in excess of 9.9% of Striper's common stock.

        a.      Sayid knew he was an affiliate of Striper by virtue of his control over the entity.  Had Sayid's affiliate status been properly disclosed, Striper's transfer agent would not have issued shares of Striper stock to the Belizean nominee entities without restrictive legends.

        b.      Sayid knew that Striper was a shell company with no or nominal non-cash assets and no or nominal operations, and in fact Sayid referred to it as such in negotiations with Person 3, Person 4, Affa, and Brown.  Even so, Sayid instructed Jasper to falsely certify annual and quarterly reports filed with OTC Markets that failed to report

16

Striper's shell status.  Had Striper's shell status been properly disclosed, Striper's transfer agent would not have issued shares of Striper stock to the Belizean nominee entities without restrictive legends.

        c.      Sayid knew that the Belizean nominee entities were under common control and/or acting in concert because he coordinated with Person 3, Person 4, Affa, and Brown to have shares issued to them in the name of the nominees and received payment from a single individual, Brown, for all of the transferred debt.  Sayid also knew that the shares issued pursuant to the Striper Debt Settlement Agreement would constitute approximately 44% of the issued and outstanding shares of Striper common stock.  Had the beneficial ownership of the Belizean nominee entities been properly disclosed, Striper's transfer agent would not have issued stock to the Belizean nominee entities without restrictive legends.

43.     Sayid's delivery of this false and misleading attorney opinion letter caused Striper's transfer agent to issue 100 million shares of Striper stock without restrictive legend to the Belizean nominee entities.  The shares issued amounted to 100 times the number of issued and outstanding shares of Striper common stock held by the public, after the reverse split engineered by Sayid had reduced the publicly held shares by 500 to one.

44.     Sayid attempted to have the Belizean nominees' shares deposited with a Belizean broker and used false representations about their affiliate status to do so.  Ultimately, the Belizean nominee entities were unable to sell their shares directly to the investing public through book-entry transfer in the OTC market because the Depository Trust Company ("DTC") placed a chill on the deposit of Striper stock.  DTC eligibility is a prerequisite to book-entry transfer of securities, which facilitates the exchange of shares by broker-dealers in the secondary market.

DTC eligibility is essential to operating a pump and dump scheme because it enables the deposit of securities in a brokerage account so that they may be sold in the secondary market in bulk.

45.      In April 2013, after Sayid failed to have the Striper stock deposited, Sayid promptly cancelled the Advantage merger, citing failure to meet financing requirements in the merger agreement as the supposed reason for the cancellation.

### III.    Sayid Completes an Undisclosed Sale of Striper to a Third Party

46.      Sayid and Jasper continued to control Striper during the period from April 2013 to July 2015, but failed to submit any quarterly or annual reports to OTC Markets during that period.

47.       In March 2015, Sayid initiated negotiations with an attorney, Person 6, concerning the sale of Striper to Person 6's client Person 7.  Sayid led Person 6 to believe that his client was purchasing control of Striper from Sayid, who was able to direct the company's activities by virtue of the debt he held for past due legal fees.  Sayid suggested that Person 7 compensate him for the sale of Striper through the payment of legal fees for purported due diligence in connection with the merger.  Structuring Sayid's compensation as legal fees, whether for due diligence or past due fees, was a pretext; in fact, this was Sayid's way of paying himself for selling control of Striper.

48.      In July 2015, Sayid received two payments totaling $30,750 from Person 7. Concurrently, Jasper, at Sayid's direction, used his preferred "A" super voting rights to effect a merger with Person 7's company, issue Person 7 shares of Striper stock, and appoint Person 7 as president and sole director of Striper.  The payment to Sayid and Sayid's control of Striper were never disclosed to investors.  The transaction was misleadingly described in the company's filings as an acquisition in exchange for shares of common stock.  Jasper facilitated the non-disclosure of the $30,750 payment to Sayid by signing, at Sayid's direction, false representations

to Person 7 that failed to identify Sayid as a control person of Striper.

49.    In February 2016, both Sayid and Jasper failed to disclose the 2015 sale of Striper in response to questions from Commission staff regarding the corporate structure of the entity.

50.    On May 6, 2016, the Commission suspended trading in Striper stock pursuant to Section 12(k) of the Exchange Act for a period of ten business days.

### IV.   Sayid Enlists Reynolds and Jasper to Prepare Nouveau Stock for Use in a Pump and Dump Scheme

51.    In June 2012, Sayid told the then-President of Nouveau, Person 1, that Nouveau would need to use his "aged legal fees" to "get [Nouveau] merged with a real company."  Sayid instructed Person 1 to apply payments made on his legal fees to Sayid's most recent invoices, in order to maximize the amount of aged debt that he held in the company while still receiving payment from Nouveau.

52.    As Sayid began negotiations with Affa and Brown regarding the issuance of Nouveau stock to them, Sayid instructed Person 1 to take various steps that that would prepare the Nouveau company for an eventual pump and dump of the stock.  In January 2013, Sayid told Person 1 to start working on completing a 1 for 800 reverse split of Nouveau's common stock, a name change, and a symbol change.  The reverse split, which was effective on April 20, 2013, reduced the total number of shares of Nouveau issued and outstanding from approximately 240 million to approximately 300,000 and thereby reduced the number of shares in the hands of public investors that were outside of Sayid's control.  Nouveau's new name was decided in consultation with Affa and Brown and obscured Nouveau's connection to the Commission's case against Geranio.

53.    In May 2013, Sayid received at least $18,100 from Affa and Brown to prepare a three-way agreement whereby Sayid would assign $50,000 of the purported legal fees owed to

19

his law firm by Nouveau to three Belizean nominee entities controlled by Affa.  Pursuant to this three-way agreement, Nouveau agreed to pay the assigned legal fees "by way of the issuance of fifty million (50,000,000) shares" of stock to the Belizean nominee entities (hereinafter referred to as the "Nouveau Debt Settlement Agreement").  Sayid participated in structuring the transaction through nominee entities that obscured the collective scheme to dump Nouveau's stock.  He drafted the Nouveau Debt Settlement Agreement and obtained the names of the nominees that were to receive shares directly from Affa and Brown.

54.     The Nouveau Debt Settlement Agreement, which was drafted and signed by Sayid, contained a number of misrepresentations and omissions known to Sayid.  First, the agreement represented that it was made and entered into in July 2012 and that Sayid had received value for the transfer of his debt as of that date.  In fact, Sayid knew that (i) he did not receive payment until May 2013, (ii) the list of nominee entities was not finalized until at least June 2013, and (iii) he signed the agreement in August 2013.  Second, the agreement obscured that the nominees were under common control, a fact Sayid knew because he had been engaged in structuring the transaction through the nominee entities, had obtained the names of the nominees from Affa and Brown, and received payment for all of his transferred debt from Affa and Brown.

55.     In June and July 2013, Sayid instructed Person 1 to install Jasper and Person 2 on Nouveau's board of directors and directed Nouveau's board to sign a letter of intent and acquisition agreement with B3Squared LLC ("B3") which contemplated a merger of the two companies.  The B3 letter of intent and provided the occasion for positive news for the planned pump of Nouveau's stock, which Sayid knew Affa and Brown intended to use to sell Nouveau shares.

56.     In order to get shares without restrictive legends into the hands of Affa and

Brown, Sayid hired Reynolds in July 2013 to provide legal opinions to Nouveau's transfer agent

to persuade the transfer agent to issue 8 million shares of Nouveau stock without an affiliate

restriction legend to the Belizean nominee entities.   At Sayid's direction, Reynolds drafted two

opinion letters, dated August 9, 2013 and September 6, 2013, addressed to Nouveau's transfer

agent that falsely concluded that 8 million shares of Nouveau stock could be issued to the three

nominee entities without restrictive legend.

57.     Reynolds knew or should have known that Sayid was using Reynolds' legal

opinion to make false statements of Rule 144 eligibility.   When Sayid hired Reynolds, Sayid

asked Reynolds to base his opinion on an unexecuted version of the Nouveau Debt Settlement

Agreement, which bore the date September 25, 2012.   Prior to preparing his opinion letter,

however, Reynolds received emails from Sayid and Person 1 indicating that the Nouveau Debt

Settlement Agreement had not, in fact, been executed by Person 1 on behalf of the company until

August 2013.

58.     In August 2013, Reynolds refused to draft an opinion letter based on the

Nouveau Debt Settlement Agreement bearing the date September 25, 2012.   In an email, he told

Sayid that the document failed to establish that had Sayid held the subject securities for one year,

as would be required to qualify for the pertinent exemption under Rule 144.   In response, Sayid

represented to Reynolds that he had five executed versions of the Nouveau Debt Settlement

Agreement, bearing various dates:  June 4, 2012, June 7, 2012, July 17, 2012, September 7,

2012, and September 25, 2012.

59.     Reynolds' August 9, 2013 and September 6, 2013 opinion letters were based

upon the purported Nouveau Debt Settlement Agreement dated July 17, 2012 and concluded that

Sayid held the subject securities for one year as was required under Rule 144.   Reynolds did not

receive an executed Nouveau Debt Settlement Agreement bearing the date July 17, 2012 until August 12, 2013, three days after he had drafted and sent to Sayid his August 9, 2013 opinion letter.

60.     Reynolds' August 9, 2013 and September 6, 2013 opinion letters contained various statements that Reynolds knew or should have known were false:

a.     Both letters falsely stated that the Nouveau Debt Settlement Agreement had been executed by Sayid, Person 1, and the Belizean nominee entities on July 17, 2012.  At the time Reynolds drafted his August 9, 2013 opinion letter, he had not received any executed agreement with the July 17, 2012 date.  At no point did Reynolds undertake to confirm when the July 17, 2012 Nouveau Debt Settlement Agreement was executed despite his receipt of red flags indicating that it was not signed on the purported date.  Among other things, Reynolds knew or should have known: (i) that he was copied on an exchange of emails in August 2013 between Sayid and Person 1 showing that they were executing the initial September 25, 2012 Nouveau Debt Settlement Agreement in August 2013, not September 2012; (ii) that after Reynolds initially refused to write an opinion letter, citing the failure to meet the one-year holding period, Sayid responded by purporting to have five agreements on different dates in June, July, and September 2012 for the same transaction; (iii) that when Sayid initially forwarded these documents, they not only pertained to the exact same transaction, they were all unexecuted; (iv) that when Sayid later provided a version of the same agreement purportedly signed on July 17, 2012 by Person 1 (Nouveau's then CEO), there was a pen mark line crossing out the date block for Person 1's signature; and (v) that Sayid never provided any credible explanation why there might be five different versions of an agreement to sell the same convertible debt,

all purportedly made on different dates.

      b.     Both letters falsely stated that the Nouveau Debt Settlement Agreement permitted issuance of 50 million shares to the Belizean nominees.  Reynolds knew or should have known that Nouveau had undergone a reverse split in April 2013, *after* the purported date of the Nouveau Debt Settlement Agreement , so the agreement – if it had genuinely been made in 2012 -- would only have permitted the issuance of only 62,500 shares.

      c.     By signing the letters as an attorney offering a legal opinion, Reynolds implicitly represented that he had conducted a reasonable inquiry into the pertinent factual premises upon which the transfer agent was expected to rely.  In actuality, Reynolds had failed to conduct any such inquiry.  Rather, Reynolds relied entirely on Sayid to confirm the veracity of the purported July 17, 2012 Nouveau Debt Settlement Agreement despite having observed, as he admitted in statements to Commission staff, that Sayid was "less than careful" and despite otherwise having received contradictory and/or incomplete information from Sayid.

61.     Reynolds knew or should have known that his false representations would be used to erroneously issue shares of Nouveau stock without restrictive legends.  Indeed, Reynolds expressly stated in his opinion letters that the issuer and the transfer agent could rely on his opinion in connection with the issuance of shares to the Belizean nominee entities.

62.     As an attorney, Reynolds had a duty to refrain from making false statements in the course of representing his clients.  Reynolds knowingly or recklessly violated this duty in issuing opinion letters based on the backdated and fabricated Nouveau Debt Settlement Agreement.  He had neither a reasonable nor good faith basis to represent that the Nouveau Debt

23

Settlement Agreement had been executed on July 17, 2012 and to base his legal determinations regarding the applicability of the Rule 144 safe harbor on that date.

63.     Reynolds also knew or should have known that his conduct in drafting the opinion letters failed to meet the standards of his profession.  Reynolds allowed Sayid to direct the factual basis of Reynolds' opinion letters despite the fact that Reynolds knew or should have known the signs of fraud described in paragraph 60.  In making these false and misleading statements in the opinion letters, despite the glaring questions of truthfulness, and without conducting any further due diligence to verify the truthfulness of the representations in his letters, Reynolds was negligent in the performance of his professional duties in making representations to Nouveau's transfer agent.

64.     Reynolds drafted his opinion letters while negotiating with Sayid to receive a share of the anticipated proceeds from the sale of Nouveau stock issued pursuant to Reynolds' letters.  On August 1, 2013, after Sayid hired Reynolds to draft the opinion letters, but before Reynolds issued his first letter, Reynolds asked about the status of Sayid's funding efforts.  Sayid responded via email "[t]hey are working on issuing the shares.  Then we need your Rule 144 (?) legal opinion to convert the debt into equity and free up the shares.  Sell the shares, get paid." On August 13, 2013, after Reynolds drafted his first opinion letter, he asked Sayid via email about "the status of the sale of the [Nouveau] shares and the payment of my fee for the opinion letter."  On September 3, 2013, one week before Affa and Brown commenced the promotional campaign for the pump and dump scheme, Reynolds sent Sayid via email a bill for prior legal services rendered.  In response, Sayid stated via email that "[t]he investors are working on getting the shares deposited" and expressed hope that he would receive funds from the sale.  On September 7, 2013, two days before the promotional campaign began, Reynolds instructed Sayid

via email to wire him a $5,000 payment "when you receive your funds next week."  Reynolds

never received the $5,000 payment; Sayid explained to him via email on October 4, 2013 that

"the shorts are killing the stock so, neither I nor the company have received any investor funds as

of yet."  Reynolds received a total of $700 from Sayid to draft the two opinion letters.

65.     Sayid caused the fraudulent and misleading opinion letters drafted by Reynolds to

be transmitted to Nouveau's transfer agent to enable the wrongful issuance of 8 million shares of

Nouveau stock without restrictive legends (more than 26 times the amount of shares issued and

outstanding after Nouveau's reverse stock split) to Affa's nominee entities.  Sayid knew when he

caused Reynolds' opinion letters to be sent to the transfer agent that the documents contained a

number of misrepresentations, including that (i) the Nouveau Debt Settlement Agreement had

been executed on July 17, 2012, (ii) the Belizean nominee entities "purchased and paid for"

Sayid's debt on July 17, 2012, (iii) the Belizean nominees acquired Nouveau shares on July 17,

2012; (iv) Sayid was not an affiliate of Nouveau, and (v) Nouveau was not a shell company.

a.     Sayid knew that the Nouveau Debt Settlement Agreement was not

executed in July 2012.  Sayid did not receive payment until May 2013, did not begin

preparing drafts of the agreement until in or around June 2013, and did not sign any

agreement until August 2013.  Had Nouveau's transfer agent known that Reynolds'

opinion letters misrepresented the date of the Nouveau Debt Settlement Agreement, it

would not have issued shares of Nouveau stock to the Belizean nominee entities without

restrictive legends.

b.     Sayid knew he was an affiliate of Nouveau by virtue of his control over

the entity and share ownership.  Had Sayid's affiliate status been properly disclosed,

Nouveau's transfer agent would not have issued shares of Nouveau stock to the Belizean

nominee entities without restrictive legends.

   c. Sayid knew that Nouveau was a shell company with no or nominal non-cash assets and no or nominal operations, and in fact Sayid referred to it as such in negotiations with Person 3, Person 4, Affa, and Brown.  Had Nouveau's shell status been properly disclosed, Nouveau's transfer agent would not have issued shares of Nouveau stock to the Belizean nominee entities without restrictive legends.

  66. Sayid also knowingly caused false and misleading information to be provided to the Belizean brokerage firm that accepted the deposit of shares from Affa's nominee entities, including indemnity letters written on behalf of the nominee entities that misstated the date of the purchase of shares and Nouveau's shell status.

  67. On September 4, 2013 in advance of the market open, Nouveau issued two press releases drafted by Sayid, one announcing the acquisition of B3, which Sayid shared with Brown before publication, and one announcing the launch of B3's purported gaming website, play31.net.  On September 9, 2013, Affa and Brown copied and used Nouveau's press releases, drafted by Sayid, in promotional emails as part of a three-day promotional campaign in furtherance of their pump and dump scheme.  A number of the promotional emails misstated the status of Nouveau's acquisition of B3 by describing it as "recently completed" or otherwise expected to close.  Nouveau's acquisition of B3 was not, and could never have been, completed due to a lack of funding.

  68. During the September 2013 promotional campaign, Nouveau's stock approximately tripled in value on unusually high trading volume, from a closing price of $0.10 per share on the last trading day before the campaign to a peak closing price of $0.29 per share during the campaign.  The share price plummeted to a closing price of $0.06 per share by the end

of September 2013 and $0.03 per share by the end of October 2013.  Between August and November 2013, Affa and Brown sold 4,751,000 shares of Nouveau stock, resulting in proceeds and causing losses to the investing public of $429,517.55.

69.     After the promotional campaign was completed, Sayid negotiated with Brown to receive a $25,000 payment from the proceeds of Affa and Brown's stock sales.  Simultaneously, Sayid unwound the B3 transaction and lied to Person 1 (Nouveau's then-CEO) and B3's attorney that the investors (Affa and Brown) had pulled out after having lost $182,000.

## V.     Sayid and Jasper Make Misrepresentations to Maintain Control of Nouveau and Continue Illegally Selling Stock in the Company

70.     In November 2013, Sayid installed Jasper as the CEO of Nouveau following Person 1's resignation.

71.     Throughout 2014, Jasper, at Sayid's direction, signed false Nouveau financial statements and submitted them to OTC Markets.  The financial statements (i) failed to disclose that 8 million shares had been issued to Affa's nominee entities in connection with the September 2013 pump and dump and (ii) failed to disclose Sayid's control of Nouveau.  Sayid and Jasper both received notice from Person 1 that the Nouveau financial statements filed with OTC Markets contained misstatements and both failed to take any action to correct the identified errors.

72.     In or around December 2014, Sayid negotiated with Person 8 regarding the sale of convertible debt arising from Sayid's purported legal fees in Nouveau.  Sayid told Person 8 that the debt could be converted into stock that could then be sold at any time, and further, that this transaction was "lawful and proper."  Sayid received $10,000 from Person 8 for the sale of his purported debt.  Sayid provided to Person 8 the same debt settlement agreement, backdated to July 17, 2012, the Nouveau Debt Settlement Agreement, that he had used in August 2013 to

assign convertible debt to Affa's three Belizean nominee entities.  The agreement was identical to the one previously used, except for naming Person 8's company as the debt purchaser in a new signature page.  The agreement reused Person 1's signature on behalf of Nouveau despite the fact that Person 1 had resigned from Nouveau in November 2013, more than a year earlier, and was never asked to review or sign any agreement with Person 8.

73.    In or around April 2015, at Sayid's direction, Jasper signed a backdated Board resolution to issue shares to Person 8 pursuant to the repurposed debt settlement agreement.  The shares were never issued to Person 8 despite his repeated follow up with Sayid, and Sayid's repeated assurances that Person 8 would receive and be able to sell his shares soon.  As recently as September 2016, months after Sayid asserted his Fifth Amendment right against self-incrimination in response to questions from Commission staff concerning Nouveau, Sayid told Person 8 that he would receive his shares and would be able to sell them once Nouveau could complete an acquisition.  Sayid further represented that Nouveau was taking active steps to complete an acquisition of an insurance or gold mining company.

**FIRST CLAIM FOR RELIEF**
**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder)**

(Against Defendants Sayid, Jasper, and Reynolds)

74.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 73 of the Complaint as if set forth fully herein.

75.    During the period from at least 2012 through September 2016, Sayid, Jasper, and Reynolds, directly or indirectly, by use of the means and instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of securities, knowingly, willfully, or recklessly (a) employed devices, schemes and artifices to defraud, (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the

28

statements made, in light of the circumstances under which they were made, not misleading, and (c) engaged in acts, practices, and courses of business which operated and which would operate as a fraud or deceit upon certain persons.

76.     By reason of the foregoing, Sayid, Jasper, and Reynolds, singly or in concert, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

### SECOND CLAIM FOR RELIEF
### (Violations of Section 17(a)(1) and (2) of the Securities Act)

(Against Defendants Sayid, Jasper, and Reynolds)

77.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 73 of the Complaint as if set forth fully herein.

78.     During the period from at least January 2012 through September 2016, Sayid, Jasper, and Reynolds, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means and instrumentalities of interstate commerce, or of the mails, in the offer or sale of securities (a) employed devices, schemes and artifices to defraud, and (b) obtained money or property by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

79.     By reason of the foregoing, Sayid, Jasper, and Reynolds, singly or in concert, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 17(a)(1) and (2) of the Securities Act [15 U.S.C. §77q(a)(1) and (2)].

**THIRD CLAIM FOR RELIEF**
**(Violations of Section 17(a)(3) of the Securities Act)**

(Against Defendants Sayid and Jasper)

80.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 73 of the Complaint as if set forth fully herein.

81.     During the period from at least January 2012 through September 2016, Sayid and Jasper, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means and instrumentalities of interstate commerce, or of the mails, in the offer or sale of securities engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

82.     By reason of the foregoing, Sayid and Jasper, singly or in concert, directly or indirectly, have violated, and unless enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. §77q(a)(3)].

**FOURTH CLAIM FOR RELIEF**
**(Violations of Section 5(a) and Section 5(c) of the Securities Act)**

(Against Defendants Sayid and Reynolds)

83.     The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 73 of the Complaint as if set forth fully herein.

84.     During the period from at least 2012 through September 2016, Sayid and Reynolds, directly or indirectly, as to Nouveau securities: (a) made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities through the use or medium of a prospectus or otherwise; or carried securities or caused such securities to be carried through the mails or in interstate commerce, by means or instruments of transportation, for the purpose of sale or delivery after sale; and (b) made use of the means or instruments of transportation or communication in interstate commerce or of the

30

mails to offer to sell or to offer to buy, through the use or medium of any prospectus or otherwise, securities without a registration statement having been filed with the Commission or being in effect as to such securities.

85.     During the relevant time period, January 2012 through September 2016, neither Nouveau nor its securities were registered with the Commission, nor was any registration of Nouveau stock in effect at that time.

86.     By reason of the foregoing, Sayid and Reynolds, singly or in concert, directly or indirectly, violated and unless enjoined will continue to violate, Sections 5(a) and (c) of the Securities Act [15 U.S.C. §77e(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.     Enter a permanent injunction restraining Sayid, Jasper, and Reynolds, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

B.      Enter a permanent injunction restraining Sayid, Jasper, and Reynolds, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)];

C.     Enter a permanent injunction restraining Sayid and Reynolds, as well as their agents, servants, employees, attorneys, and other persons in active concert or participation with

them, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)];

D.      Require Sayid, Jasper and Reynolds to disgorge their ill-gotten gains and losses avoided, plus prejudgment interest;

E.      Order the defendants to pay an appropriate civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

F.      Enter an order barring Sayid, Jasper, and Reynolds from participating in any offer of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

G.      Enter an order barring Sayid and Jasper from serving as an officer or director of a public company, pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

H.      Enter an order barring Sayid and Reynolds from participating, directly or indirectly, in the preparation or issuance of any opinion letter in connection with the offer or sale of securities pursuant to, or claiming exemption under, Securities Act Section 4(a)(1), including any exemption claimed utilizing the safe harbor provided by Rule 144 under the Securities Act, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d);

I.      Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

J.      Award such other and further relief as the Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a

jury trial in this action of all issues so triable under the claims in this Complaint.


Respectfully submitted,


<u>//s// Caitlyn Campbell</u>
Caitlyn Campbell
Richard Harper* (MA Bar No. 634782)
Michael J. Vito* (MA Bar No. 675524)
Dahlia Rin* (MA Bar No. 674317)
Attorneys for Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
Boston Regional Office
33 Arch Street; 24th Floor
Boston, MA  02110
(617) 573-8979 (Harper direct)
(617) 573-4590 (fax)
harperr@sec.gov (Harper email)

Dated:  April 12, 2017




*Not admitted in S.D.N.Y.