UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------- X
SECURITIES AND EXCHANGE          :
COMMISSION,                      :
                    Plaintiff,   :
                                 :
     -against-                   :
                                 :
MUSTAFA DAVID SAYID and NORMAN   :
T. REYNOLDS,                     :
                                 :
                    Defendants.  :
------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/25/2019

No. 17 Civ. 2630 (JFK)
**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFF SECURITIES AND EXCHANGE COMMISSION:
     Richard M. Harper II
     Michael J. Vito
     Dahlia Rin
     SECURITIES AND EXCHANGE COMMISSION

FOR DEFENDANT MUSTAFA DAVID SAYID:
     Harlan J. Protass
     PROTASS LAW PLLC

FOR DEFENDANT NORMAN T. REYNOLDS:
     Brian J. Poronsky
     Joseph C. Platt
     KATTEN MUCHIN ROSENMAN LLP

**JOHN F. KEENAN, United States District Judge:**

     Before the Court is a motion by the Securities and Exchange

Commission ("SEC") for summary judgment in this enforcement

action against Defendants Mustafa David Sayid ("Sayid") and

Norman T. Reynolds ("Reynolds").  The SEC charges that Sayid and

Reynolds violated Section 5 of the Securities Act of 1933 ("the

Securities Act"), which makes unlawful the public sale of

unregistered securities, by offering and selling restricted

1

shares of the common stock of Nouveau Holdings, Ltd. ("Nouveau" or "NHLI"). The SEC further charges that Sayid and Reynolds violated Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act") and Section 17(a) of the Securities Act, which prohibit fraud in the purchase or sale of a security, by providing false statements regarding the date of the unlawful sale's transfer agreement in two attorney opinion letters that were provided to Nouveau's transfer agent, Transfer Online, Inc. ("Transfer Online").

In defense, Sayid argues that the transfer agreements were executed as they were agreed to—even though Nouveau did not sign the agreement until much later—and he was not a necessary participant in the sale and subsequent resale of the stock. Reynolds argues that he performed adequate due diligence by ensuring that he received copies of signed transfer agreements before his opinion letters were provided to Transfer Online and Transfer Online did not sufficiently rely on his opinion letters when it issued the stock in unrestricted form.

For the reasons set forth below, the SEC's motion for summary judgment is GRANTED in its entirety.

**I. Facts**

The following facts are undisputed:

## A. The Debt Settlement Agreement

Sayid is a New York City-based securities attorney. Reynolds is a Houston, Texas-based securities attorney. Beginning around March or April 2012, Sayid began negotiating a securities transaction with Michael Affa ("Affa") and Mitchell Brown ("Brown") for the sale of $50,000 of the debt owed to Sayid by Nouveau (formerly known as Spectrum Acquisition Holdings, Inc. ("Spectrum" or "SPAH")) to certain Belizean entities that Affa and Brown represented. Sayid negotiated the terms of the sale pursuant to a "debt settlement agreement" ("the DSA" or "the Agreement") that proposed a three-way transaction: (1) Sayid would assign to the Belizean entities $50,000 worth of the debt owed to him by Nouveau; (2) the Belizean entities would pay to Sayid $50,000 in exchange for the assignment of the debt; and (3) Nouveau would pay off the outstanding assigned debt by issuing 50 million shares of Nouveau stock to the Belizean entities. The DSA was to be made and entered into by: (i) Sayid's law firm, Sayid & Associates, LLP, as the "Assignor Creditor"; (ii) the Belizean entities as the "Assignee Creditors"; and (iii) Nouveau as the "Debtor".

Sayid and the Belizean entities negotiated the terms of the DSA through at least September 25, 2012, and the Agreement was not "finalized" until at least that date. Between April 2012 and August 2013, Sayid also had conversations with Dale Henry

("Henry"), the president of Nouveau, concerning, among other things, the DSA.   Sayid, however, did not present Henry with a copy of the Agreement for Henry to sign on behalf of Nouveau until August 2, 2013.[1]   The DSA that Sayid sent to Henry in August 2013, was dated September 25, 2012, and it was signed by the two other parties to the three-way transaction: Sayid and three Belizean entities.

Prior to sending the signed DSA to Henry in August 2013, Sayid had exchanged multiple emails with Affa and Brown earlier in 2013 that attached drafts of the DSA with changes that Affa and Brown had requested, including changes to the names of and number of Belizean entities that would be parties to the Agreement.   In June 2013, for example, the number of Belizean entities changed from five to three.

In August 2013, Sayid received a signed signature page from the Belizean entities, and on August 2, 2013, Sayid forwarded the partially-signed Agreement to Henry.   Sayid copied Reynolds

---

[1] The Court notes that a three-way agreement, such as the DSA, cannot be "executed" without the signatures of all three parties to be bound by the agreement.   Accordingly, the undisputed fact that Nouveau did not sign the DSA until August 2013, at the earliest, necessarily establishes Sayid's and Reynolds's liability under § 5 of the Securities Act because the DSA was not executed one year before Transfer Online issued the Nouveau stock in unrestricted form. Nevertheless, as discussed below, because there is also no dispute regarding whether the agreement was ever "finalized" on a date prior to September 25, 2012, there is, accordingly, no genuine dispute regarding Sayid's and Reynolds's mental state and their liability under § 10(b) of the Exchange Act and § 17(a) of the Securities Act.

on this email, thereby providing Reynolds with a copy of Sayid's request that Henry sign the DSA, and a copy of the DSA that was signed by Sayid and three—not five—Belizean entities.  The signatures of the Belizean entities were dated September 25, 2012.  The date next to Sayid's signature was blank.

### B.  Rule 144

Section 5 of the Securities Act permits an exemption from its registration requirements known as "Rule 144".  As relevant here, to comply with Rule 144, a person must meet certain conditions regarding holding periods and manners of sale. Reynolds and Sayid were familiar with Rule 144 and its requirements; both had written Rule 144 attorney opinion letters for clients in the past.  Reynolds has written over 400 such letters.

Nouveau did not have a registration statement in effect with the SEC during the relevant time period.  Therefore, to comply with the requirements of § 5, Transfer Online issued stock, such as Nouveau's, as "restricted" stock, which bore a restrictive legend on the certificate.[2]  However, Transfer Online allowed a stockholder to provide it with an attorney opinion letter, opining that a proposed restriction-free stock issuance

---

[2] A restrictive legend is placed on unregistered stock certificates to indicate that the shares are not to be sold to the public.

complied with Rule 144, in order to remove the legend on restricted stock.

## C.  The Attorney Opinion Letters

In connection with the three-way transaction pursuant to the DSA, Brown asked Sayid to obtain Rule 144 opinion letters for the Belizean entities.  Sayid agreed to do so, and on July 29, 2013, before Sayid had presented a copy of the DSA to Henry for Nouveau's signature, Sayid emailed Reynolds and asked him for two attorney opinion letters: "One for the SPAH investors/purchasers and One [sic] for M. David Sayid.  Here is the Debt Settlement Agreement.  I have an executed copy that I shall forward."  Sayid's email attached a DSA that was dated September 25, 2012, but it was unsigned by any party.  Four days later, Sayid copied Reynolds on his August 2, 2013 email to Henry with the September 25, 2012 DSA.  Sayid's email to Henry said: "Please find the executed Debt Settlement Agmt.  Please counter sign and forward to me with a copy to [Reynolds] as [Reynolds] is providing the necessary legal opinion."

Three days later, on August 5, 2013, Sayid emailed Reynolds and asked for the opinion letters.  Later that same day, Reynolds responded and said the DSA did not meet the requirements of Rule 144.  Reynolds wrote: "Unless I am missing something, you have not held the securities for one year.  Since the issuer is a non-reporting company, a minimum of one year

must elapse before you can sell the securities under Rule 144. You acquired the securities on September 25, 2012."

Sayid replied that his debt was over three years old and attached an opinion letter from a different lawyer, Thomas Boccieri, ("the Boccieri letter") which Sayid described as "an opinion that was provided to me . . . where I had converted my debt to equity.  Please use the same opinion as it was presented to two different transfer agents and passed with flying colors." Reynolds reviewed the Boccieri letter, but he did not accept its analysis and, the following day, August 6, 2013, Reynolds responded to Sayid: "I am not convinced that your Engagement Letter constitutes a security in the context of Rule 144.  I could write an opinion on September 25, 2013.  If you need an opinion now, I suggest you use Mr. Boccieri."

The next day, August 7, 2013, Sayid responded to Reynolds, stating in relevant part: "I commenced negotiating with the buyers of my Spectrum debt sometime in February 2012.  We have several executed copies of the debt settlement agreement[,]" and he then listed five agreements by date: June 4, 2012; June 7, 2012; July 17, 2012; September 7, 2012; and September 25, 2012. Sayid asked if Reynolds wanted copies of the earlier executed DSAs.  Reynolds responded: "Yes.  Please send all of the executed agreements."

Later that same day, Sayid emailed Reynolds and attached
four DSAs, none of which were signed.  Sayid's email stated: "I
have the signature pages for the July 17th, 2012, September 7,
2012 and, of course, September 25, 2012.  I will continue to
look for the signature pages for the June 2012 dates."

Two days later, on August 9, 2013, Reynolds emailed Sayid a
signed attorney opinion letter ("the Rule 144 letter" or "the
Letter") without ever receiving a signed copy of a DSA dated
July 17, 2012.  The Letter was dated August 9, 2013, it was
addressed to Transfer Online, and it began by stating: "On July
17, 2012, more than one year ago, that certain Debt Settlement
Agreement . . . was executed by [Nouveau], [Sayid,] and [the
three Belizean entities]."  The Letter repeatedly described the
sale and assignment of debt as having occurred on July 17, 2012.
In the body of Reynolds's email to Sayid with the signed Rule
144 letter, Reynolds said: "Please check my facts.  If they are
correct, you may send the letter to Transfer Online, Inc."
Reynolds then listed his wiring instructions for payment.

On August 10, 2013, the day after Sayid received the
Letter, Sayid emailed Henry and said: "[Reynolds] wants to use
the July 17, 2012 Debt Settlement Agreement as opposed to the
September 25, 2012 version."  Sayid requested Henry "execute and
forward back to me" a copy of the DSA dated July 17, 2012.
Henry signed a signature page with a date of July 17, 2012, and

returned it to Sayid, who then forwarded it to Reynolds on August 11, 2013.  The next day, Reynolds told Sayid: "I need the signatures of the [Belizean entities], as well."  That same morning, Sayid emailed Reynolds a signature page for the Belizean entities that was dated July 17, 2012.

On August 11, 2013, before Sayid had provided Reynolds with the relevant signatures of the Belizean entities, Sayid forwarded Reynolds's Rule 144 letter to Henry and asked Henry to send it to Transfer Online "to free up the shares" for the Belizean entities.  Henry sent the Letter to Transfer Online, as requested, and on August 27, 2013, Transfer Online issued three million shares of unrestricted Nouveau stock to the three Belizean entities.

On September 6, 2013, Sayid emailed Reynolds and requested a second Rule 144 opinion letter for unrestricted Nouveau stock to be issued to the same Belizean entities pursuant to the same DSA dated July 17, 2012.  Sayid requested a legal opinion "identical in form to the previous one that you issued."  That same day, Reynolds provided Sayid with a second signed Rule 144 letter addressed to Transfer Online.  As before, Reynolds's letter concluded that the proposed issuance of unrestricted Nouveau stock to the Belizean entities complied with the requirements of Rule 144 because, among other things, the sale and assignment had occurred on July 17, 2012, and thus, it met

the one-year holding period.  On September 9, 2013, Henry sent
Reynolds's second Rule 144 letter to Transfer Online, and on
September 12, 2013, Transfer Online issued approximately five
million unrestricted shares of Nouveau stock to the three
Belizean entities.

Reynolds received two payments of $350 from Sayid in return
for writing the two Rule 144 letters.

### D.  The Promotional Campaign and Sale

In connection with the issuance of the unrestricted Nouveau
stock, Transfer Online provided Sayid with affiliate letters and
conversion letters for the Belizean entities to execute, which
Sayid then provided to Affa and Brown for their resale of the
stock to certain penny stock investors.  Affa and Brown paid
approximately $220,000 to multiple promoters who sent out blast
email messages in September 2013 touting Nouveau stock.  Affa
and Brown paid some of the promoters prior to the start of the
promotional campaign and paid others only after the Belizean
entities sold Nouveau stock during and following the campaign.
In total, the Belizean entities sold approximately four million
of the restriction-free shares issued to them pursuant to the
July 17, 2012 DSA and Reynolds's Rule 144 letters.  The sales
generated approximately $275,000 in proceeds.  Although the
Belizean entities do not appear to have ever paid Sayid the
$50,000 that he was owed for the debt he sold via the DSA, on

October 1, 2013, around the same time the promotional campaign concluded, Brown wired Sayid $25,000.

## II.  Summary Judgment Standard

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); SEC v. Frohling, 851 F.3d 132, 136 (2d Cir. 2016).  "A genuine dispute exists when the evidence is such that, if the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party." Frohling, 851 F.3d at 136 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  "Summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict, i.e., it is quite clear what the truth is, and no rational factfinder could find in favor of the nonmovant." Id. (citations and internal quotation marks omitted).  A court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Dallas Aero., Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury

could reasonably find for the [non-movant]." <u>Hayut v. State Univ. of New York</u>, 352 F.3d 733, 743 (2d Cir. 2003) (quoting <u>Liberty Lobby</u>, 477 U.S. at 252) (alterations in original).

**III.  Section 5 Liability**

The SEC alleges that Sayid illegally offered and sold restricted Nouveau common stock by means of a falsely backdated DSA, and that Reynolds indirectly sold the stock by drafting the Rule 144 letters that Transfer Online used to issue the shares in unrestricted form.

Section 5 of the Securities Act makes it unlawful, directly or indirectly, to publicly offer or sell unregistered stock, unless the offering is covered by an exemption. 15 U.S.C. § 77e; <u>Frohling</u>, 851 F.3d at 135.  "To state a cause of action under Section 5, one must show '(1) lack of a [required] registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale.'" <u>Frohling</u>, 851 F.3d at 136 (quoting <u>SEC v. Cavanagh</u>, 445 F.3d 105, 111 n.13 (2d Cir. 2006)) (alteration in original). "Scienter need not be proven." <u>SEC v. Greenstone Holdings, Inc.</u>, No. 10-cv-1302 (MGC), 2012 WL 1038570, at *11 (S.D.N.Y. Mar. 28, 2012), <u>aff'd sub nom.</u> <u>Frohling</u>, 851 F.3d 132.

The pertinent exemption to § 5 liability in this case is Rule 144's one-year holding requirement, which required the

Belizean entities to have owned the shares of Nouveau for at least one year prior to Transfer Online's reissuance of the stock without restriction. See 17 C.F.R. § 230.144(d)(1)(ii). For the one-year holding period, ownership means the Belizean entities needed to have bought and paid for the shares. See id. § 230.144(d)(1)(iii).

## A.  Execution Date

Sayid argues that a genuine dispute exists regarding when the DSA was executed because Sayid and the Belizean entities executed it on a rolling basis throughout 2012, and, although Henry did not sign the DSA until August 2013, from Sayid's perspective, Henry's signature was not necessary for it to be effective because all of the parties necessary to effectuate the Agreement's economic objectives had signed it in 2012.

Sayid's claim is flatly contradicted by the evidence. First, not only does Sayid admit that Henry did not sign—and thus, did not execute—the Agreement any earlier than August 2, 2013, he also admits that the DSA was not "finalized" by the Belizean entities until at least September 25, 2012.  Second, Sayid acknowledges that Nouveau was a necessary party to the three-way agreement.  Indeed, the DSA contractually obligated Nouveau to provide 50 million shares of its common stock to the Belizean entities in exchange for no longer owing $50,000 in legal fees.  Any assertion that Nouveau's signature was not

required for the DSA to be effective—and thus, for the Belizean entities to be bound by the Agreement—is patently false. Finally, the evidence shows that Sayid knew Henry's signature was necessary when, on August 2, 2013, and again on August 10, 2013, Sayid asked Henry to sign the DSA and send it to Reynolds for the Rule 144 letters. Accordingly, no genuine dispute exists regarding whether the DSA was a binding, executed transfer agreement any earlier than September 25, 2012.

### B. Unregistered Securities

Sayid next argues that a genuine dispute exists regarding whether Rule 144's one-year holding period was met when Transfer Online issued the unrestricted Nouveau stock to the Belizean entities. Sayid's claim is not genuine.

On August 27 and September 12, 2013, pursuant to the Rule 144 letters obtained by Sayid and drafted and signed by Reynolds, Transfer Online issued the shares of unregistered Nouveau common stock to the Belizean entities for sale to the public. Because there is no genuine dispute that the DSA was not executed prior to September 25, 2012, there is, accordingly, no genuine dispute that the Belizean entities had not owned their stake in Nouveau for the required one-year period at the time Transfer Online issued the unregistered stock. Accordingly, Transfer Online was not permitted to issue the

shares in unrestricted form based on Rule 144's one-year holding period exemption.

## C. Sayid

Sayid argues that he was not a substantial participant in the offer or sale of the unrestricted Nouveau securities because his participation was solely related to the sale of his non-security debt to the Belizean entities.

"A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she 'engaged in steps necessary to the distribution of [unregistered] security issues.'" Frohling, 851 F.3d at 136 (quoting SEC v. Chinese Consol. Benevolent Ass'n, Inc., 120 F.2d 738, 741 (2d Cir. 1941)) (alteration in original). "The participation must be substantial, not de minimis." Greenstone Holdings, 2012 WL 1038570 at *11 (citing SEC v. Universal Express, Inc., No. 04-cv-2322 (GEL), 2007 WL 2469452, at *4 n.3 (S.D.N.Y. Aug. 31, 2007)). "The 'necessary participant test . . . essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place'—in other words, whether the defendants' acts were a 'substantial factor in the sale transactions.'" SEC v. Mattera, No. 11-cv-8323 (PKC), 2013 WL 6485949, at *10 (S.D.N.Y. Dec. 9, 2013) (quoting SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y.

2007), aff'd sub nom. SEC v. Altomare, 300 F. App'x 70 (2d Cir. 2008)) (alteration in original).

There is no genuine dispute that Sayid was a necessary and substantial participant in the unlawful offer and sale of unrestricted Nouveau stock to the Belizean entities, and its later resale to the penny investors. First, Sayid directly solicited, negotiated, and consummated the three-way transaction in which unrestricted Nouveau stock was issued to the Belizean entities in exchange for Sayid's former debt. Indeed, Sayid's crucial participation in this regard is best evidenced by the undisputed fact that Sayid did not present the DSA to Henry for Nouveau's signature until the month before the unrestricted shares were to be issued to the Belizean entities. Sayid's actions with respect to the DSA, standing alone, are sufficient to hold him liable as a substantial participant in the unlawful sale of unregistered Nouveau stock.

Second, Sayid was instrumental in obtaining the Rule 144 legal opinion letters that allowed Transfer Online to issue the stock in unrestricted form. Indeed, there is no dispute that Sayid provided the information to Reynolds on which Reynolds based his legal opinion in the letters to Transfer Online. Sayid also paid Reynolds's fees.

Finally, Sayid was a necessary participant in the subsequent resale of the unrestricted Nouveau shares to the

16

penny investors because he was the one who obtained the required affiliate letters and conversion letters from Transfer Online that were needed for the resale, which Sayid then provided to the Belizean entities before the promotional campaign began. Accordingly, Sayid's undisputed actions are sufficient to hold him liable under § 5.

### D. Reynolds

Reynolds argues that he too was not a substantial participant in the unlawful sale and, further, the SEC has failed to demonstrate that he was relatively culpable for any fraudulent activity.

In the Second Circuit, summary judgment for a violation of § 5 is appropriate where the SEC has demonstrated that there is no genuine dispute that an attorney's legal opinion letter caused a transfer agent to improperly remove restrictive legends and issue stock without an applicable registration statement in unrestricted form. See Frohling, 851 F.3d at 137; SEC v. Sourlis, 851 F.3d 139, 145 (2d Cir. 2016).

There is no genuine dispute that Reynolds was a necessary and substantial participant in the unlawful sale and resale of restricted Nouveau stock. First, Reynolds knew that no registration statement was in effect for the offered securities, and thus, his Rule 144 letters were needed for Transfer Online to issue the shares in unrestricted form.

Second, there is no dispute that Transfer Online issued the shares to the Belizean entities in unrestricted form because of Reynolds's Rule 144 letters. Reynolds argues that a triable issue exists regarding Transfer Online's "reliance" on his letters, but whether Transfer Online could have issued the shares in unrestricted form via a different exception is irrelevant. What matters here is that Reynolds's Rule 144 letters told Transfer Online that it could issue unrestricted shares, and there is no genuine dispute that the shares were issued in that form because of Reynolds's letters.

Finally, as discussed below, there is no dispute that Reynolds's decision to provide signed legal opinions that stated the DSA was executed on July 17, 2012, was, at the very least, reckless. Whether Frohling and Sourlis support a version of strict liability under § 5 against attorneys who draft false opinion letters is an open question, but here, there is no genuine dispute that Reynolds acted recklessly when drafting the first Rule 144 letter without ever seeing a signed DSA dated July 17, 2012. Therefore, § 5 liability is appropriate even though the SEC has not proved beyond any genuine dispute that Reynolds was relatively culpable for Sayid's fraud.

Accordingly, because there is no dispute as to the first and third elements of § 5 liability (lack of a registration statement and use of interstate channels), and there is no

genuine dispute that Sayid and Reynolds engaged in the unlawful offer and sale of restricted Nouveau common stock, not subject to an exemption, the SEC's motion for summary judgment is granted with respect to Sayid's and Reynolds's liability under § 5 of the Securities Act.

### IV.  Section 10(b) and Section 17(a) Liability

The SEC also charges that Sayid and Reynolds violated sections 10(b) and 17(a) by providing false statements regarding the DSA's execution date.  "Section 10(b) of the Exchange Act and Rule 10b-5, which prohibit fraud in the purchase or sale of a security, are violated if a person has '(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities.'" Frohling, 851 F.3d at 136 (quoting SEC v. Pentagon Capital Mgmt. PLC, 725 F.3d 279, 285 (2d Cir. 2013)).

"[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the [misrepresentation] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  "The fact that a statement is made in private—for example, to a transfer agent—rather than to the public does not foreclose a statement's materiality." Greenstone Holdings, 2012 WL 1038570 at *5.

"Insofar as [an] attorney's opinion letter and other documents necessarily inform the transfer agent's decision, misrepresentations in such documents may be considered important by the reasonable investor." Id. (quoting SEC v. Czarnik, No. 10-cv-745 (PKC), 2010 WL 4860678, at *5 (S.D.N.Y. Nov. 29, 2010)) (alteration in original).

"Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud; or at least knowing misconduct." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (citations omitted). "Scienter may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." Frohling, 851 F.3d at 136 (alteration and quotation marks omitted). "In order to show scienter, the SEC must demonstrate either that the defendant had actual knowledge of material facts that were omitted or distorted or failed or refused to ascertain and thereafter accurately disclose such facts after having been put on notice as to their possible existence." Greenstone Holdings, 2012 WL 1038570 at *6 (quoting SEC v. Wellshire Sec., Inc., 773 F. Supp. 569, 576 (S.D.N.Y. 1991)).

"The elements of a claim under § 17(a) of the Securities Act, which prohibits fraud in the 'offer or sale' of a security,

15 U.S.C. § 77q(a), are '[e]ssentially the same' as the elements

of claims under § 10(b) and Rule 10b-5." <u>Frohling</u>, 851 F.3d at

136 (quoting <u>SEC v. Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d

Cir. 1999)) (alteration in original).  Section 17(a)(1) "forbids

the direct or indirect use of any device, scheme, or artifice to

defraud;" § 17(a)(2) "makes it unlawful to obtain money or

property through misstatements or omissions about material

facts." <u>SEC v. Yorkville Advisors, LLC</u>, No. 12-cv-7728 (GBD),

2013 WL 3989054, at *2 (S.D.N.Y. Aug. 2, 2013).

### A. Sayid

Sayid raises no genuine dispute of material fact as to his

§ 10(b) and § 17(a) liability.  First, as explained above, no

genuine dispute exists regarding whether the DSA was executed

and in effect any earlier than September 25, 2012.  Accordingly,

there is no genuine dispute that Sayid's statements to Reynolds

regarding earlier executed DSAs were false.

Second, there is no genuine dispute that Sayid's statements

and his provision of the falsely dated July 17, 2012 DSA were

material.  Sayid's statements and the false DSA were the

foundation of Reynolds's conclusion that the proposed issuance

of Nouveau stock met Rule 144's one-year holding requirement.

Further, there is no genuine dispute that Sayid intended for his

false statements to be conveyed to Transfer Online: Sayid

provided the statements to Reynolds for the express purpose that

they be included in his Rule 144 letters to Nouveau's transfer agent. Without Sayid's false statements, Reynolds would not have issued the letters, and Transfer Online would not have issued the Nouveau stock to the Belizean entities in unrestricted form.

Third, no genuine dispute exists regarding whether Sayid used a deceptive device. After Reynolds rejected using the September 25, 2012 DSA, Sayid bolstered his false statements by providing Reynolds with an agreement that was falsely designed to look like it had been executed by the parties on July 17, 2012.

Finally, Sayid argues that a genuine dispute exists regarding fraudulent intent because (1) he did not believe Henry's signature was necessary for the DSAs to be effective when he made his false statements to Reynolds; and (2) Reynolds was the one who decided to use the July 17, 2012 date in the Rule 144 letters. As discussed above, Sayid's belief that Nouveau's signature was not required is not genuine, or, at the very least, it was a reckless disregard for the truth. As Sayid himself admitted, the DSA was not "finalized" until at least September 25, 2012. Accordingly, there is no genuine dispute that Sayid knew or recklessly disregarded knowing that his statements regarding the July 17, 2012 DSA were false.

Next, regardless of whether a dispute may or may not exist with respect to whether Sayid told Reynolds to use the July 17, 2012 DSA for the Rule 144 letters, it is undisputed that Sayid repeatedly told Reynolds that he had an executed version of the July 17, 2012 DSA while Sayid was, at the same time, working to obtain a backdated signature page from Henry. Further, Sayid knew that Nouveau had never signed a DSA at any time in 2012 but, by means of the Nouveau signature page falsely dated July 17, 2012, Sayid intended to manipulate Reynolds into opining that Nouveau had executed the Agreement on that date. Sayid's representations to Reynolds regarding the DSA's execution date were, at a minimum, a reckless disregard for the truth. Accordingly, the SEC has established Sayid's liability under § 10(b) and § 17(a)(1) (use of a device to defraud).

**B. Reynolds**

The SEC argues that Reynolds facilitated the fraudulent sale of unrestricted Nouveau stock by recklessly disregarding Sayid's obviously false statements regarding the DSA's execution date and by failing to investigate the conflicting information that Sayid provided regarding this key legal requirement of Reynolds's Rule 144 letters. Reynolds argues that genuine disputes exist regarding whether he breached his duty of care when drafting the Rule 144 letters and whether he had fraudulent intent.

## 1.  Heightened Duty of Care

> Under the securities laws, a statement of opinion
> includes an implied representation that the speaker
> rendered the opinion in good faith and with a reasonable
> basis.  Good faith alone is not enough.  An opinion must
> have a reasonable basis, and there can be no reasonable
> basis for an opinion without a reasonable investigation
> into the facts underlying the opinion.  [The defendant]
> thus implicitly represented that he had conducted "a
> reasonably sufficient examination of material legal and
> factual sources and [had] reasonable certainty as to the
> subjects addressed therein."

Greenstone Holdings, 2012 WL 1038570 at *7 (quoting Weiss v.

SEC, 468 F.3d 849, 855 (D.C. Cir. 2006)) (alterations in

original).

Here, no genuine dispute exists regarding Reynolds's

professional obligation to have had a reasonable basis for

opining that the DSA was executed on July 17, 2012.  If any of

the facts Reynolds asserted in his Rule 144 letters were suspect

or inconsistent, Reynolds had a responsibility to make further

inquiry.  If such an inquiry would not have given him sufficient

confidence as to the relevant facts, or if he elected not to

undertake the inquiry, Reynolds should have refused to provide

the opinion.

As discussed below, there is no genuine dispute that

Reynolds breached this heightened duty by electing not to

undertake any inquiry into the DSA's true execution date and,

instead, choosing to recklessly incorporate Sayid's factual

assertions regarding the execution date into the Rule 144

letters.  Accordingly, Reynolds did not have a reasonable basis for his legal conclusions and assertions to Transfer Online, and he breached his heightened duty of care.

### 2. Scienter

Scienter may be established through a showing of reckless disregard for the truth or conduct that is highly unreasonable and which represents an extreme departure from the standards of ordinary care. <u>Frohling</u>, 851 F.3d at 136.  "[A] lawyer, no more than others, can[not] escape liability for fraud by closing his eyes to what he saw and could readily understand." <u>SEC v. Frank</u>, 388 F.2d 486, 489 (2d Cir. 1968).

There is no genuine dispute that Reynolds recklessly disregarded (1) the true date that the DSA was executed; and (2) whether his Rule 144 letters accurately informed Transfer Online that the one-year holding requirement was satisfied.  First, when Sayid initially requested the Rule 144 letters from Reynolds, Sayid provided him with an unsigned copy of the September 25, 2012 DSA but said that he had "an executed copy that I shall forward."  Four days later, Sayid emailed Henry, cc'ing Reynolds, and asked Henry to sign a backdated DSA and forward the fully-signed version to Reynolds.  This should have aroused suspicion in Reynolds that the DSA was executed by Nouveau in August 2013, not September 2012, as Sayid's earlier email and the face of the document purported.

Second, it was only after (a) Reynolds pushed back and told
Sayid that the September 25, 2012 DSA did not support a Rule 144
exemption, (b) Sayid then pushed back and questioned Reynolds's
legal analysis, and (c) Reynolds then gave Sayid the option of a
September 25, 2013 Rule 144 letter or no letter at all, that
Sayid conveniently asserted that he had multiple DSAs that met
the one-year holding requirement.  This should have aroused
additional suspicion regarding the true execution date of the
DSA, especially because of Reynolds's heightened duty to conduct
a reasonable investigation when drafting an attorney opinion
letter.  Indeed, even further suspicion should have been aroused
when, after Reynolds asked Sayid to "send all of the executed
agreements," none of the versions that Sayid forwarded were
signed.

Third, Reynolds admitted during his deposition that when
reviewing a convertible instrument for compliance with Rule 144,
Reynolds normally ensured that the consideration was paid to the
company.  Indeed, Reynolds could have verified the DSA's true
execution date by simply asking for verification of the $50,000
payment that the Belizean entities promised to Sayid under the
terms of the Agreement.  Reynolds, however, chose not to make
such an important inquiry as part of his Rule 144 analysis. Cf.
17 C.F.R. § 230.144(d)(1)(iii) ("If the acquiror takes the
securities by purchase, the holding period shall not begin until

the full purchase price or other consideration is paid or given by the person acquiring the securities from the issuer or from an affiliate of the issuer.")

Finally, after failing to conduct any meaningful investigation of the information Sayid provided regarding perhaps the most important factual assertion in Reynolds's legal analysis, Reynolds drafted, signed, and delivered an opinion to Sayid that stated that the Belizean entities had purchased and paid for the Nouveau shares on July 17, 2012, and Nouveau had executed the Agreement on that same date—crucial assertions that Reynolds made without first ensuring that such representations were accurate. Further, not only did Reynolds not reasonably investigate the truth of his opinion, instead, he totally abdicated his heightened duty to the one person who wanted the favorable legal opinion as soon as possible by simply telling Sayid to "check my facts. If they are correct, you may send the letter to Transfer Online, Inc."

Reynolds argues that triable issues exist regarding whether his actions were reasonable and whether he acted with scienter because he had worked with Sayid in the past, he did not think Sayid's actions were suspect, and Reynolds's expert opined that he conducted a reasonable inquiry. The Court disagrees. Reynolds's concessions, that he did not investigate the relevant execution date and he issued his first letter without the

necessary signatures, together with the documentary evidence that Sayid only raised the earlier executed DSAs after Reynolds refused to issue an opinion; Reynolds, a very experienced drafter of Rule 144 letters, was expressly on notice that Sayid had asked Henry to sign at least one backdated DSA; and Reynolds's own deposition testimony that his basis for using the July 17, 2012 DSA was because Sayid told him which date to use, do not create an issue that is genuine. Accord Frohling, 851 F.3d at 138 (finding no error in the district court's conclusion that the defendant's later testimony that he did not know a certain fact did not create a genuine dispute).

Reynolds's avoidance of the truth of the DSA's execution date in the face of his decades of experience drafting Rule 144 letters and his heightened duty to reasonably investigate such a crucial—and ultimately false—fact, that he then asserted numerous times in his legal opinions to Transfer Online, was reckless. Accordingly, Reynolds is liable for securities fraud. See Greenstone Holdings, 2012 WL 1038570 at *7 (granting summary judgment on scienter-based fraud claims against an attorney opinion letter writer whose conduct was "reckless at best"); see also Frohling, 851 F.3d at 137-38.

Because there is no genuine dispute that Reynolds's Rule 144 letters were material misstatements, made in connection with an offering of securities, and for which he received $700, the

SEC has established Reynolds's liability under § 10(b) and § 17(a)(2) (obtaining money through misstatements).

**V.  Conclusion**

For the foregoing reasons, the motion of the SEC for summary judgment is GRANTED as against Sayid and Reynolds for violating Sections 5 and 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934.

**SO ORDERED.**

Dated:  New York, New York
        November 25, 2019

_____
John F. Keenan
United States District Judge